IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PATRICIA PAYSTRUP,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL T. BENSON, in his official capacity; JAMES MCDONALD, in his official capacity; and SOUTHERN UTAH UNIVERSITY,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:13cv00016-DB<br><br>District Judge Dee Benson |

   Plaintiff Patricia Paystrup ("Plaintiff" or "Professor Paystrup") filed the instant

employment discrimination lawsuit against Michael T. Benson, in his official capacity, James

McDonald ("Dean McDonald"), in his official capacity, and Southern Utah University

(collectively "Defendants"), alleging that Defendants committed several violations of the

Americans with Disabilities Act (the "ADA") and the Rehabilitation Act of 1973

("Rehabilitation Act").  The case is now before the court on Defendants' Motion for Summary

Judgment.  (Dkt. No. 27.)

   The court heard oral argument on the motion on November 6, 2014.  At the hearing,

Plaintiff was represented by Austin Egan.  Defendants were represented by Daniel Widdison.

Prior to the hearing, the court considered the memoranda and other materials submitted by the

parties.  Since taking the matter under advisement, the court has further considered the law and

facts relating to the motion.  Now being fully advised, the court renders the following

Memorandum Decision and Order.

**<u>BACKGROUND</u>**

Professor Paystrup began working at SUU as an assistant professor in 1985.  (Dkt. No. 36 at 3.)  After a brief time away from the University, she returned in 1995 and was granted tenure in 1998.  (<u>Id.</u>)  Professor Paystrup is still a tenured professor at SUU at the present time.  (<u>See</u> Dkt. No. 2.)  Between 1994 and 2001, Professor Paystrup was diagnosed with systemic lupus, fibromyalgia, and chronic anemia.  (<u>Id.</u> at 3.)  These diseases have limited her ability to read, concentrate, think, and communicate in writing.  (<u>Id.</u>)

In 2002, Plaintiff Paystrup's department chair told her that "[t]he dean wants to know if you want to go on medical leave."  (Dkt. No. 41 at 10-11.)  She responded that medical leave would not help.  (<u>Id.</u>)  However, she asked for a couch in her office so that she could rest.  The University promptly granted that request.  (<u>Id.</u>)  Between 2003 and the spring of 2008, Professor Paystrup discussed with her department chair the possibility of not teaching technical writing and news writing courses at the same time, but she did not specifically request an accommodation during this time period.  (<u>Id.</u> at 11-12.)  The department chair responded that the University needed to provide two sections of news writing because many students had "problems" with the other professor who taught the course.  (<u>Id.</u>)

In June 2003, the department chair conducted an annual review of Professor Paystrup's performance and noted that her student evaluations were "much lower" than the department average.  (<u>Id.</u> at 11.)  Around this same time, Professor Paystrup experienced a significant flare up of her symptoms, but did not report it to her department chair or to the dean.  (<u>Id.</u>)

Pursuant to SUU policy, Professor Paystrup was to submit her mandatory Post-Tenure Review documents in September 2005, but she failed to do so.  (Id. at 12.)  She finally submitted the documents in October 2007.  (Id.)

A few months after submitting her Post-Tenure Review documents, Professor Paystrup made a request to her department chair for a one hour break between classes for the upcoming Fall 2008 semester.  (Id. at 12-13.)  After initially indicating that he would grant the break, the department chair ultimately denied Professor Paystrup's request and scheduled her to teach three consecutive classes without a break.  (Id. at 14-15.)  Additionally, three to four weeks into the Fall 2008 semester, the department chair asked Professor Paystrup if she could teach an additional writing class.  (Id. at 15.)  Professor Paystrup assumed this additional responsibility. (Id.)  However, Professor Paystrup later informed her department chair that the workload was "killing her."  (Id. at 59.)

Around this same time, Professor Paystrup submitted her Faculty Annual Activity Report ("FAAR") for the '07-'08, school year, as required by SUU policy.  (Id. at 13.)  The Report indicated that Professor Paystrup's teaching evaluations were "considerably below" the university and college average.  (Id.)  As a result, Professor Paystrup committed to submit a teaching and research development plan.  (Id.)  However, Professor Paystrup did not submit the plan by the end of the school year despite the fact that she had been given a one hour break between all of her classes during the Spring 2009 semester.  (Id. at 17-18.)  This prompted a meeting between Professor Paystrup and Dean McDonald on June 18, 2009, to discuss why the plan had not yet been submitted.  (Id.)  At that time or earlier, Dean McDonald sent a

memorandum to Professor Paystrup asking her to submit her improvement plan and indicating that her non-performance was an issue that may necessitate a fitness for duty examination. (Id.)

A few days after her meeting with Dean McDonald, Professor Paystrup suffered a life-threatening inguinal hernia and strangulated bowel. (Id. at 51.) Although this condition first arose on June 26, 2009, she had to wait several weeks before the surgery could take place because of her anemia. (Id.) The surgery was eventually conducted on July 15, 2009 and it took a few weeks for Professor Paystrup to recover. (Id.) The day prior to her surgery, Paystrup and her department chair met and discussed her medical condition. (Id.) She asked the department chair to inform anyone who needed her that she was having surgery and needed to recover. (Id.) The department chair did not notify Dean McDonald or Provost Brad Cook ("Provost Cook") of the surgery. (Id.)

Due to her medical emergency, Professor Paystrup did not immediately see letters sent by Provost Cook dated June 22, 2009 and July 30, 2009. (Id. at 20.) These letters informed Professor Paystrup that Dean McDonald had suggested that Professor Paystrup be placed on probation due to her failure to timely submit her Post-Tenure Review documents and her teaching and research improvement plan. (Id. at 18-19.) The letters also gave Professor Paystrup a deadline for challenging the recommendation. (Id. at 19.) Professor did not see the letters until at least October 2009. (Id. at 20.)

Despite her surgery, Professor Paystrup taught four courses during the Fall 2009 semester. (Id.) Again, her request for a one hour break between classes was not specifically granted for this semester. (Id. at 21.) However, this time the department chair provided Professor Paystrup with a graduate student to help with her grading, teaching, and other duties.

Professor Paystrup requested a specific student for the position because the student wanted to help teach one of her classes.  (Id. at 22-23.)

In the middle of the semester, on October 9, 2009, the University placed Professor Paystrup on probation.  (Id. at 67.)  At that time, Professor Paystrup had still not submitted her teaching and research improvement plan (which was then eleven months overdue) and had never requested an extension.  (Id. at 22-23.)  Consequently, Dean McDonald sent Professor Paystrup a memorandum that informed her that he would no longer accept the plan and that he was going to formally request that the University "undertake a 'Fitness for Duty' evaluation as the next due process step during [her] probation."  (Id. at 23-24.)

Professor Paystrup did not respond to the memorandum.  (Id. at 24-25.)  In fact, other than the memorandum, there was no communication between Professor Paystrup and Dean McDonald from June 2009 until March 3, 2010.  (Id.)  At this later date, Dean McDonald went to Professor Paystrup's office and, while standing in the hallway outside of the doorway, informed Professor Paystrup that she was "being ordered to undergo a psychological examination."  (Id. at 26.)  A fellow professor and a student witnessed this exchange.  (Id. at 60.)  During this encounter, Dr. Paystrup informed Dean McDonald about her emergency surgery.  (Id. at 52.) She further informed him that that she had asked her department chair to inform anyone who needed to know that she had surgery, and to take care of anything that needed her attention.  (Id.) Dean McDonald acknowledged the department chair's failure and stated, "Oh, this is a pattern with him."  (Id.)  Dean McDonald followed up this encounter by sending another memorandum to Professor Paystrup on March 18, 2010, requesting that she attend a fitness for duty evaluation with Dr. Joanne Brown-Cameron ("Dr. Cameron").  (Id. at 26.)

In response to this memorandum, Professor Paystrup drafted a letter outlining her version of the events that led to her failure in submitting her teaching improvement plan.  (Id. at 26.)  In her letter, Professor Paystrup noted the emergency surgery and her failed attempts to finalize her teaching improvement plan with her department chair.  (Dkt. No. 23-15.)  Specifically, she indicated that although she was ready to finalize her teaching improvement plan with her department chair on April 22, 2009, the department chair scheduled over their meeting and did not make himself available to discuss the plan with her before her emergency surgery.  (Id. at 2-3.)  Professor Paystrup further informed Dean McDonald that while she was recovering from her surgery, the department secretary moved all of her paperwork to a new location without the Professor's knowledge.  (Id. at 4-5.)  After this move, Professor Paystrup was unable to locate some of the vital paperwork for her teaching improvement plan.  (Id.)

Dean McDonald responded to Professor Paystrup's letter with a memorandum dated March 22, 2010.  (Dkt. No. 41 at 27.)  No later than this time, Dean McDonald knew about Professor Paystrup's disability because he noted her claim for serious chronic health conditions and lupus-related chronic anemia.  (Id. at 47, 59.)  However, Dean McDonald also noted that Professor Paystrup's response did not include any justification for her failure to comply with deadlines from 2005 through 2008.  (Id. at 27.)   Consequently, Dean McDonald renewed his demand that Professor Paystrup submit her teaching and research improvement plan.  (Id. at 52.)  Dean McDonald also declined to rescind his order for Professor Paystrup to attend a fitness for duty examination.  (Id. at 27.)

Professor Paystrup attended the fitness for duty evaluation on March 31, 2010.  (Dkt. No. 36-5.) After conducting the evaluation, Dr. Brown-Cameron concluded that, "The

6

development of a corrective action plan or the implementation of steps toward termination would be appropriate." (<u>Id.</u> at 11.) This was based on Dr. Cameron's finding that, "It is clear that for the last several years Patricia has not been performing the essential functions of her position." (<u>Id.</u>) It is disputed whether Dr. Cameron knew what Professor Paystrup's essential functions were at the time of the FFD.

On May 5, 2010, Professor Paystrup and her attorney met with David McGuire (SUU HR) and Michael Carter (SUU's general counsel). (Dkt. No. 41 at 29.) During this meeting, McGuire presented Professor Paystrup with the option of applying for long-term disability benefits. (<u>Id.</u>) While represented by counsel, Professor Paystrup agreed to apply for long-term disability and filled out a form to that effect. (<u>Id.</u>) She did so because she was experiencing significant health problems "and couldn't see living like that for the next ten years." (<u>Id.</u>)

In July 2010, the University provided a copy of Dr. Cameron's report to Professor Paystrup after several requests. (<u>Id.</u>) Professor Paystrup was dissatisfied with the results of the report and exercised her right to have a follow-up fitness for duty evaluation performed by a doctor of her choice. (<u>Id.</u> at 29-30.) This follow-up evaluation was performed by Dr. James Ottesen ("Dr. Ottesen") on August 19, 2010. (<u>Id.</u> at 30.) In his report, Dr. Ottesen indicated that, "Even when she was feeling better physically . . . this past summer of 2010, Dr. Paystrup still did not make efforts to bridge the gap between herself and the administration. That is not a question of intelligence, that is a reflection about her judgment and personality flaws." (<u>Id.</u> at 31-32.) Dr. Ottesen additionally found that,

> If Dr. Paystrup is content with her interpersonal style and believes that the issue is not hers and that she is just being treated wrongfully by the university, she will not improve much over time. If Dr. Paystrup is willing to commit herself to psychotherapy and to addressing her maladaptive personality traits, she should be able to function better at the

university as long as her work load is not so extensive that her working memory deficit is exposed.  (Id.)

Dr. Ottesen concluded that, "It also appears to this clinician that Southern Utah University can do more to support Dr. Paystrup and can reach a working plan with her instead of just releasing her. It is likely that Dr. Paystrup still has more to offer this university as she manages her issues."  (Id. at 32.)

The day before this second fitness for duty examination, Professor Paystrup was informed by Provost Cook that she was being placed on administrative leave.  (Id. at 33.)  The Provost hoped that the leave would allow Professor Paystrup the opportunity to address the missed deadlines and get caught up, but he did not express this hope to Professor Paystrup.  (Id. at 34.)

Around September 2010, the new department chair informed Professor Paystrup that Dean McDonald had requested her to submit a FAAR for the '09-'10 academic year.  (Id. at 36.) At that time, Professor Paystrup believed that because she was on administrative leave she was relieved of her obligation to submit a FAAR.  (Id. at 36-37.)  Nevertheless, she did not convey this belief to either her department chair or Dean McDonald.  (Id.)

On October 18, 2010, Provost Cook initiated formal proceedings to evaluate Professor Paystrup's fitness for duty by requesting to convene the Faculty Review Board.  (Id. at 62.) Provost Cook doubted that Dr. Paystrup's lupus and fibromyalgia caused Dr. Paystrup to experience fatigue and depression, and was "weary" and "untrustful" that Dr. Paystrup actually required a one-hour break between classes.  (Id.)

In November 2010, Provost Cook cancelled his request to convene the Faculty Review Board after the University received a letter from Professor Paystrup that included a point-by-

point response to the petition as well as scores of supporting documentation including narratives and correspondence.  (Id. at 35.)  Provost Cook further responded to Professor Paystrup by prompting her to address the three issues that had been the basis for her being placed on probation: scholarship, teaching, and the teaching improvement plan.  (Id. at 36; Dkt. No. 27-3 at 154-155.)

On December 7, 2010, Dean McDonald informed Professor Paystrup that because she had not submitted a FAAR for the '09-'10 school year, he was recommending that she be placed on suspension with pay.  (Dkt. No. 41 at 37.)

On December 10, 2010, Professor Paystrup sent a letter to Provost Cook outlining why she was unable to comply with the Dean's requests that she submit her teaching improvement plan.  (Id.)  In her letter, Professor Paystrup noted an improvement in her symptoms based on the use of a newly-prescribed medication. (Id.)

Provost Cook responded to the December 10th letter on December 13, 2010, noting that Prof. Paystrup's response did not fully address her chronic failure to respond to policy-mandated deadlines.  (Id. at 38.) The next day, Provost Cook placed Professor Paystrup on suspension with pay.  (Id.)  He testified that had she submitted her policy-mandated documents, he would not have done so.  (Id.)  As with the administrative leave, Provost Cook did not explain to Professor Paystrup what the terms of her suspension were.  (Id. at 53.)  Professor Paystrup finally submitted her FAAR for the '09-'10 school year the day after she was officially suspended.  (Id. at 38.)

On February 28, 2011, Dean McDonald requested that Professor Paystrup attend an updated fitness for duty evaluation because of the time that had passed since the previous

examination in March 2010 and because of Professor Paystrup's reports of improved health.  (Id. at 39.)  Although two evaluations were scheduled in early 2011, Professor Paystrup failed to attend either of them.  (Id. at 39-41.)  In a letter to Professor Paystrup dated April 27, 2011, Provost Cook informed her that her department chair and Dean McDonald both recommended that she be placed on suspension without pay for an entire year.  (Id. at 50.)

Despite these recommendations, the University allowed Professor Paystrup to resume teaching a full load of classes in the fall of 2011.  (Id. at 41.)  During this semester, Professor Paystrup and the University entered into EEOC mediation wherein Professor Paystrup specifically requested accommodations of an hour break between classes and a schedule that required her to teach only one writing class per semester.  (Id.)  A communication error prevented Professor Paystrup from having the one hour break during the Spring 2012 semester, but she accepted an alternative accommodation of having a graduate student help her with her duties.  (Id. at 43.)  Since that time, she has been granted both of her requested accommodations every semester.  (Id. at 44.)

Professor Paystrup filed a Complaint on January 7, 2013, alleging that the Defendants continuously discriminated against her based on her medical condition.  (Id. at 3-8.)  The alleged discriminatory actions include failing to grant her requested accommodations of a one-hour break between classes and a schedule that that required her to teach only one writing class per semester in 2008; requiring her to submit to a fitness for duty examination in March 2010; refusing to give her the University-wide College and University Professional Association salary increase every year since 2009; placing her on administrative leave for the Fall 2010 semester; petitioning to convene the Faculty Senate Board of Review in October 2010; suspending her with

pay for the Spring 2011 semester; failing, from November 2010 through February 2011, to respond to her attorney's phone calls, e-mails, and letters regarding a mediation date; ordering her to submit to a follow-up fitness for duty examination—which she did not attend—in March 2011; and treating her unfairly after she returned to work in the fall of 2011. (Id.) Plaintiff alleges that these discriminatory actions demonstrate that Defendants failed to provide her with reasonable accommodations, subjected her to adverse employment actions based on her disabilities, retaliated against her for asserting her rights, and failed to enter into the interactive process as required by the ADA. (Id.)

Defendants argue that they cannot be liable for some of the allegedly discriminatory actions because they are time barred by the relevant statutes of limitations. (Dkt. No. 27 at 2.) Additionally, Defendants deny that any of their actions were discriminatory. (Id. at viii-ix.) Instead, they assert that Plaintiff's unrebutted history of missing deadlines and her overall decline in work performance caused the University to take disciplinary action against her. (Id. at 8-16.) Defendants also argue that they granted every request for accommodation made within the statutes of limitations and participated in the interactive process in good faith. Accordingly, the Defendants have moved for summary judgment, contending that there are no genuine issues of material fact that would preclude the court from ruling as a matter of law that the Defendants cannot be found liable under the ADA or the Rehabilitation Act.

## DISCUSSION

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). "[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

### Statutes of Limitations:

For ADA claims, a plaintiff must file a discrimination charge with the EEOC within 300 days of the discriminatory action. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). In this case, Professor Paystrup filed a charge with the EEOC on May 5, 2011. (Dkt. No. 2 at 6.)

For Rehabilitation Act claims, a plaintiff must file a complaint within four years of the discriminatory action. See Baker v. Board of Regents of State of Kan., 991 F.2d 628, 632 (10th Cir. 1993); Utah Code Ann. § 78B-2-307. Professor Paystrup filed her Complaint in this case on January 7, 2013. (Dkt. No. 2.)

Nevertheless, under both the ADA and the Rehabilitation Act, certain actions are not time barred if they are part of a continuing violation and at least one similar discriminatory action occurred within the relevant statute of limitations. See National Railroad Passenger Corp., 536 U.S. 101; Davidson v. America Online, Inc., 337 F.3d 1179 (10th Cir. 2003).

The court finds that the allegedly discriminatory actions against Professor Paystrup do not constitute a continuing violation of the ADA or the Rehabilitation Act. Additionally,

although SUU's Policy 6.22 XIV explicitly states that a faculty member may be "terminated or given a position with reduced states for substantially impaired performance for medical reasons" (Dkt. No. 41 at 46), Professor Paystrup does not provide any evidence that indicates that SUU used this policy to discriminate against her or any other disabled employee.  Therefore, Policy 6.22 XIV cannot be used to demonstrate a continuing violation of the ADA or the Rehabilitation Act.

Consequently, any ADA claims based on acts prior to July 9, 2010 and any Rehabilitation Act claims based on acts prior to January 7, 2009 are time barred.

### ADA Claims

The ADA prohibits employers from discriminating against employees and perspective employees on the basis of a disability: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  However, the ADA does not excuse an employee from performing the essential functions of her job.  Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir. 1995).  Thus, where a disabled employee has been accommodated and is still not performing the essential functions of her job, discipline is appropriate.  Anderson v. Coors Brewing Co., 181 F.3d 1171 (10th Cir. 1999) (holding that where an employee does not perform the essential function of the job, termination is appropriate); Morgan v. Hills, Inc., 198 F.3d 1319, 1323 (10th Cir. 1997); see also Cross v. Valley Services, Inc., 963 F.Supp 2d 1232 (D. Utah 2013).

Plaintiff does not contend that Defendants failed to reasonably accommodate her at any time within the statute of limitations.  Nevertheless, Plaintiff argues that the University violated the ADA within the relevant time period because it subjected her to adverse employment actions based on her disability and failed to enter into the interactive process.  (Dkt. No. 36 at 55-56.)

Adverse Employment Actions

Professor Paystrup alleges that, within the statute of limitations, the University subjected her to adverse employment actions based on her disability and as retaliation against her for asserting her rights.  (Dkt. No. 36 at 55-56.)   Specifically, Professor Paystrup alleges that the University discriminatorily placed her on administrative leave; suspended her with pay; withheld some annual pay increases; and demanded that she submit to an updated fitness for duty examination.  (Id.)

Defendants respond that, given Professor Paystrup's multiple failures to meet deadlines and address the University's concerns, the disciplinary actions against her were justified.  The court agrees.

Despite numerous warnings of the consequences of missed deadlines, it is undisputed that Professor Paystrup failed to turn in her mandatory Post-Tenure Review documents, her teaching and research improvement plan, and her '09-'10 FAAR until several months—or even years—after they were due.  Professor Paystrup also failed to respond at all to several of the attempts to get her to submit the documents after they were past due.  Additionally, Professor Paystrup did not ask for an accommodation concerning her ability to submit the documents.  In fact, even during times when her medical conditions were not acting up, she still failed to turn in her mandatory documents in a timely manner.

Turning in mandatory documents in a timely manner and being responsive to the administration are clearly essential functions of Professor Paystrup's job—and she repeatedly failed to perform them.  This conclusion is supported by the history of events listed above as well as the reports of both doctors who performed fitness for duty examinations on Professor Paystrup.  Therefore, the court finds as a matter of law that Professor Paystrup cannot show that the University's reasons for undertaking disciplinary action were pretextual.

In addition to finding that Professor Paystrup has failed to come forward with sufficient evidence to support her claim of pretext, the court finds that no jury could reasonably find that any of the specific disciplinary actions undertaken by the University constitute a violation of the ADA.  As to the administrative leave and suspension with pay, Professor Paystrup was paid her full salary throughout the entire process and returned to her full teaching position the next school year.  Such circumstances are sufficient to conclude that these disciplinary actions did not violate the ADA.  See Benavides v. City of Oklahoma City, 508 F. App'x 720 (10th Cir. 2013) (unpublished) (indicating that administrative leave restrictions are de minimis when the employee is paid his full salary).  Additionally, Professor Paystrup's health improved during her paid time off—which is significant considering the fact that she agreed to apply for long-term disability benefits just a few months earlier because of her health problems.  It also appears that the suspension with pay was the catalyst for Professor Paystrup's decision to finally turn in her past due FAAR for the '09-'10 school year.  After all, she did not respond to the multiple requests and warnings concerning the delinquent report until immediately after she was officially suspended.  Consequently, the court finds that neither the administrative leave nor the suspension constitutes a violation of the ADA in this case.

With respect to the University's decision to deny Professor Paystrup's annual College and University Professional Association ("CUPA") pay increases, the court finds that although Professor Paystrup has not received a CUPA salary increase since 2009, she does not show any connection between this decision and her disability.  CUPA sets salary benchmarks for performance based on region and type of institution and SUU uses this information to calculate their own salary benchmarks.[1] The CUPA salary increases are ultimately given at Dean McDonald's discretion "based on performance and productivity," but Provost Cook can overrule his decisions.  (Dkt. No. 36-2 at 111-112; Dkt. No. 36-3 at 208.)

Due to Professor Paystrup's repeated failures to act in accordance with the University's policies and requests from 2005 on, it is not readily apparent how the University's denial of a discretionary salary increase could be deemed discriminatory.  Furthermore, Professor Paystrup does not demonstrate that she was entitled to the salary increases (i.e. she provides no evidence that her performance and productivity merited the salary increases).  She also has not provided any evidence that any other professors who have consistently failed to meet deadlines have received CUPA salary increases.  Therefore, the court finds that Professor Paystrup has not provided sufficient evidence for a jury to reasonably find that the University's decision to deny her CUPA salary increases violates the ADA.

Finally, the University's demand for an updated fitness for duty examination cannot be construed as an adverse employment action in this case.  The Tenth Circuit has made it clear that subjecting an employee to a psychological examination can be vital for understanding an employer's ADA obligations to that employee.  See McKenzie v. Dovala, 242 F.3d 967 (10th

---

[1] In the oral hearing, counsel estimated that the CUPA salary increases were only as much as a couple thousand dollars a year.

Cir. 2001).  In fact, the <u>McKenzie</u> court reversed the district court, which had granted an

employer's motion for summary judgment, in part because the employer did not subject the

employee to a psychological examination. <u>Id.</u> at 975 ("Dovala did not even submit McKenzie for

a standard psychological test as provided for by Wyo. Stat. Ann. § 9-1-704(b)(vii).  Without an

'individualized assessment' of the precise nature and likelihood of the risk stemming from

McKenzie's illness, a genuine dispute of material fact remains regarding whether she is qualified

to resume a position in the Office where she worked successfully for a decade."); <u>see also</u>

<u>Koessel v. Sublette Cnty. Sheriff's Dep't</u>, 717 F.3d 736, 744 (10th Cir. 2013) ("Koessel relies on

<u>McKenzie</u>, where we reversed a district court's grant of summary judgment in part because the

plaintiff's employer had not ordered her to undergo a psychological examination. . . . But here,

Sheriff Bardin ordered Koessel to undergo not one but two individualized assessments.")

In that light, the court finds that the fitness for duty examination and the proposed

updated examination do not constitute adverse actions in this case.  After all, Professor Paystrup

made a disability claim and the University needed to figure out how to properly accommodate

her.  Moreover, the updated examination was requested only after Professor Paystrup reported

improved health due to her medication and therapy.  This indicates that Professor Paystrup's

limitations and necessary accommodations might have changed—something an updated

examination could have helped the University determine.  Finally, even if an updated

examination could be construed as an adverse employment action in this case, the University

merely "demanded" that Professor Paystrup subject herself to a follow-up examination—she

never actually attended one.

<u>Interactive Process</u>

Plaintiff also alleges that Defendants failed to participate in the interactive process in good faith.  "The federal regulations implementing the ADA envision an interactive process that requires participation from both parties." Templeton v. Neodata Services, Inc., 162 F.3d 617, 619 (10th Cir. 1998); 29 C.F.R. § 1630.2(o)(3).  This interactive process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.  29 C.F.R. § 1630.2(o)(3).  The employer's duty to engage in the interactive process is triggered once an employee makes an adequate request for an accommodation, thereby placing the employer on notice.  EEOC v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011).

To demonstrate that the University failed to enter into the interactive process, Plaintiff alleges that Defendants refused to discuss the two fitness for duty reports with her, failed to answer several letters and e-mails between November 2010 and March 2011, and wrongfully petitioned to convene the Faculty Review Board.   (Dkt. No. 36 at 60-65.) Plaintiff also asserts that Provost Cook and Dean McDonald did not participate in the interactive process in good faith, but wished to terminate her.  (Id.)

However, it is clear that the University was participating in the interactive process at all relevant times.  Both of Professor Paystrup's requested accommodations, the one hour break and a schedule that did not require her to teach more than one writing class per semester, dealt with the teaching duties of her job.  Thus, the interactive process was ultimately geared toward accommodating Professor Paystrup in her teaching duties.  Due to the administrative leave and the suspension with pay imposed for the '10-'11 school year, Professor Paystrup was not teaching during the time period in which she says the Defendants failed to participate in the

interactive process.  In fact, as soon as she resumed teaching, Professor Paystrup was appropriately accommodated.  Therefore, it is unclear how more immediate responses to Professor Paystrup's letters and e-mails could have affected her requested accommodations.  The same is true of a more immediate discussion of the fitness for duty reports.  Regardless, it is evident that the University was responding to Professor Paystrup's communications throughout the relevant time period.

For example, several of the letters and e-mails that the Defendants allegedly ignored refer to ongoing communications between Professor Paystrup and the University.  (See e.g. Dkt. No. 37-7 ; 37-10.)   Similarly, Provost Cook cancelled the Faculty Review Board petition upon receipt of Professor Paystrup's letter responding to the petition.  At that time, he further opened the channels of communication by inviting her to address the bases of the University's disciplinary actions.  Moreover, the University worked with Professor Paystrup so that she has retained her position at the University and has been paid her full salary throughout the relevant time period.  The University has also granted every requested accommodation—or provided an acceptable alternative accommodation—within the statute of limitations.  This is the best imaginable result of the interactive process and the University did its part to facilitate this end.

Based on the foregoing, the court grants Defendants' Motion for Summary Judgment regarding all of Plaintiff's ADA claims

### Rehabilitation Act Claims:

Courts have long recognized that claims under the ADA and the Rehabilitation Act are almost entirely overlapping.  See Woodman v. Runyon, 132 F. 3d 1330 (10th Cir. 1997) ; Fleming v. State Univ. of New York, 502 F. Supp 2d 324 (D.N.Y. 2007).  Therefore, to the

extent that the Rehabilitation Act claims are based on the same actions as the ADA claims, the Court similarly finds that there is insufficient evidence for a jury to reasonably find for Plaintiff on her Rehabilitation Act claims.

Insofar as the Rehabilitation Act claims are based on actions that took place between January 7, 2009 and July 9, 2010, they are not time barred as are any parallel ADA claims. However, in Plaintiff's Complaint, she alleges only that one relevant action occurred during that time period: the University required Professor Paystrup to submit to a fitness for duty examination and failed to provide a copy of the exam to her for up to four months. (Dkt. No. 2 at 3-4.)[2] As discussed above, a psychological examination is judicial encouraged and can be vital to helping an employer understand its ADA obligations to an employee—as was the case here where SUU was able to better understand Professor Paystrup's disability as a result of the examination. Therefore, the University's decision to subject Professor Paystrup to the original fitness for duty examination did not violate the Rehabilitation Act.

Based on the foregoing, the court grants Defendants' Motion for Summary Judgment regarding all of Plaintiff's Rehabilitation Act claims

## CONCLUSION

In sum, the court concludes that no jury could reasonably find in favor of the Plaintiff on any of her claims. Accordingly, Defendants' Motion for Summary Judgment is GRANTED.

DATED this 5th day of February, 2015.

---

[2] In her Opposition to Defendants' Motion for Summary Judgment, Plaintiff also seems to argue that she was discriminated against in the fall of 2009 when, despite her request, the University did not give her an hour long break and required her to teach a writing class. (Dkt. No. 36 at 59-60.) This allegation was not in the Complaint and cannot be relied upon for purposes of this motion. Even if it was in the Complaint, the University provided Professor Paystrup with a graduate assistant to help with teaching and grading. (Id.) This was a reasonable alternative accommodation—as is clear from the fact that Professor Paystrup accepted the same accommodation in 2012.

BY THE COURT:

_____

Dee Benson
United States District Judge